Rel. Grant v. United Airlines, and Mr. Norton. Thank you, Your Honor. May it please the Court, William Norton for Plaintiff Appellant David Grant. The District Court's decision should be reversed for three reasons. First, the District Court's conclusion that claim presentment was not adequately pled ignores that as a military contractor, claims were actually presented for United's work, and they were presented to the Air Force. Second, the District Court's speculations as to why claim presentment might not have occurred were utterly implausible and unsupported by the record. Third... Do you agree that your complaint has to meet Rule 9 standards and allege fraud with sufficient specificity, and that it also needs to establish not just a possible case for recovery, but a plausible case for recovery? I would agree with that, Your Honor, yes. Right. That's correct, Judge Duncan. The retaliation claim is only a Rule 8 standard, and it's argued that the District Court's dismissal of Mr. Grant's retaliation claim should be reversed because the Court applied the wrong pre-2009 legal standard under the Act. And as to claims presented to the District Court, the District Court's decision should be reversed because the Court applied the wrong pre-2009 legal standard under the Act. And as to claims presented to the District Court, the standard articulated by this Court was in U.S. ex-rel Nathan, and in that opinion, Judge Keenan wrote that where specific allegations of defendant's fraudulent conduct necessarily lead to the plausible inference that false claims were presented to the government, the requirements of Rule 9 can be satisfied in the absence of particularized allegations of specific false claims. And we think it's important that Nathan was a pharmaceutical case. And in a case involving a drugmaker or health care provider under the FCA, a plaintiff, be it a key time or later or the government itself, will only have a valid claim if the underlying fraudulent conduct resulted in bills to Medicare or Medicaid. The statute is the False Claims Act, and one of the initial questions that presents itself is whether the defendant's claim is that you've identified no false claims that were actually presented. That's right, Your Honor, but we believe that we've satisfied the standard. That's an initial hurdle. Are you saying then that you can satisfy the presentment requirement because there was only one client and there was only one service, in other words, there were single parties on either side, only one person doing the work and one person contracting to have the work performed? Well, that is our argument. I will just note that United was a subcontractor. Right. I realize that. And Pratt & Whitney and Boeing are in there, too. But in terms of the actual work performed, the maintenance, so it seems to me your presentment claim rises and falls on the allegation where you have one customer essentially and you have one person doing the work of the customer that their claim necessarily was presented because the presentment in a nutshell, isn't it? Tell me what more you have for presentment than that. That's a fair statement. I would say that United was the only company in the world that repaired the inlets and core thrust reversers of the C-17 engines, and the Air Force was the only payer in the world that paid for that work at the end of the year. United certified those inspections, and the engines went immediately back to the Air Force at a facility adjacent to the jet shop for immediate installation and use on the aircraft in the serviceable engine pool. And at that point, United had given those engines directly back to the Air Force and certified that the repairs were valid in accordance with Air Force technical orders, and that was what the Air Force expected. What false claim are we talking about? Well, United falsely certified... At the end of the day, you still have to show that there was a false claim, that there was a necessary inference that a false claim was presented. Well, Your Honor, the false claims... Well, United caused false records and false claims to go to the Air Force in the form of falsely certified repairs and inspections that it documented on customer maintenance tags that were affixed directly to the engines. Can I just clarify, though? In the operative complaint, which I think is the second amended complaint, is that correct? That's correct, Your Honor. Does that complaint explain how United billed for its work on these engines? On that point, Your Honor, I think that there might have been some muddying of the waters in the district court's opinion and in the defendant's arguments. I'm asking specifically about the complaint. In the complaint, we don't allege that United submitted bills or invoices to the government. Can you explain how the bills, the process by which the bills got to the entity that was making the payment? Well, the entity would be the Air Force. I don't want you to take your time now, but I think you reserve some time for the rebuttal, if you would help me with that. Yes, Your Honor. I think that to answer it in short is that United caused false claims to be submitted to the Air Force for the work by falsifying its repairs. And under the act, to knowingly cause to be made or used a false record or statement material to a false or fraudulent claim submits a contractor to liability. And that's what we suggest here, and that while we don't have a copy of an invoice or a bill, we know that the Air Force did pay $1.5 billion in a few years. One of the problems I had was that when I looked at the Lusby and Grubbs opinions from these other circuits, the complaints there were very specific as to what engines and what improper tools there were and what engines were defectively repaired and what employees were involved. In other words, Rule 9 requires, when you read Rule 9 in conjunction with the False Claims Act, it requires a degree of specificity as to, you know, what engine, what tools, what certification, what employees. I understand Your Honor's concern. Our answer to that is that during a period of six years, Mr. Grant observed that the required certified tools that United needed to obey Air Force orders in doing its repairs were simply absent. The radiometer required to perform fluorescent penetrant inspections of cracks on rotating fan blades, for example, was completely absent from the jet shop whatsoever. And so every repair done without that specifically required piece of equipment was false. And also for six years, United had an uncertified swager tool that it performed hydraulic line repairs that had half the power of pounds per square inch that the Air Force required. And so every hydraulic line and every engine had a hydraulic line, many of them repaired every time. Those are just two examples of a layer upon layer of violations that permeated this entire time period. Go ahead. My question is a little different. My question goes to some assurance or some specificity with respect to the false claims that were actually presented to the government for payment. I'm not questioning what was observed or what was and what wasn't done or what was or wasn't done with improper equipment. My question is about that last piece. And as I understand it, you have to do one of two things. You have to either allege with specificity that a false claim was actually presented to the United States for payment or you have to demonstrate a pattern of conduct that would necessarily have led to the submission of false claims. And that's the piece that I was hoping for some clarification on that is grounded in the operative. And it's that second category that necessarily leads to the plausible inference that false claims were presented. That we stand on. And in that regard, it's important to note, I think, not only that the causes to be presented is the text of the statute, but also that the Supreme Court has confirmed repeatedly that a government subcontractor can be liable. And United States v. Bornstein in 1976, the Supreme Court stated that when a government subcontractor can be liable. But those are very general comments. What I'm looking for is what I think Rule 9 requires, which is specific. Where is the necessary inference that a specific false claim was presented to the government? Because, see, if you don't have that, then you transmute this false claims act into a scheme of regulatory noncompliance. And the statute wasn't ever meant to be that way. I mean, you have discussions about tools being improperly maintained. And that there was improper training and exercise of improper training of inspectors. Improper training of inspectors, improper maintenance of tools. Well, okay. I mean, maybe so. I'm willing to say that. But that, you know, even if I accept all of that about maintenance of tools and the training of inspectors as correct, that seems to me to add up to a claim of regulatory noncompliance rather than a necessary inference that a false claim was represented. And there are other ways of getting at regulatory noncompliance. You know, you can have agency supervision. Or you can have, if Congress wants to create it, it can create a private cause of action or it can create a no cause of action that's enforceable by the agency. And we have numerous things. But my concern here is that in the absence of the specificity and the kind of complaints you're making about maintenance of equipment and training of inspectors, it all may be true. But that's a violation of regulations. And there have to be other ways to check that. It just seems to me you risk stretching this particular statute beyond the function it was intended to perform. I understand Your Honor's concern and observation. I would perhaps respond with two things. First, we do allege very specific instances such as Paragraph 103 of the Second Amendment Complaint in which United Supervisors instructed technicians to retrieve a part to repair a core reverser from a dumpster after it had been, well, eight parts actually, after they had been previously discarded as unserviceable and instructed them to repair the engine and put it back into service with those parts retrieved from the dumpster. And we have a specific date in the complaint where that happened and we believe that it's possible to specifically track those and other noncompliant repairs such that the claims for those repairs can be traced to claims. How many specific acts do you allege by date? That's just one example, Your Honor. There are several others, including specific repairs done with uncalibrated tools and equipment. And I know you said there was like a several-month absence of the required calibrated tool and then there was no tool at all for a short period of time, right? That's right. So we believe that Discovery, we believe that we have very specific periods of time like that four-month period where there's no question that the repairs violated the regulations, Air Force orders actually, and Discovery would only confirm the extent of the violations. And if I might make one more point that speaks to this, the U.S. Air Force, the entire purpose of the C-17 Globemaster maintenance program, which the Air Force paid for, was so that the Air Force would have confidence that when one of these engines came out of the serviceable pool barn on the Air Force base in Charleston, it could have the confidence that they were serviceable and they had been repaired and inspected according to very specific military standards, the violation of which, as we note, can lead to court martial. Could you reserve some of this maybe for rebuttal? I will, Your Honor. And unless you have further questions, I will save the remainder of my time. Thank you. Thanks. Mr. Harrison, let's hear from you. Thank you, Your Honor. May it please the Court. My name is Keith Harrison. I'm with the law firm of Crowell & Moring, and we represent United Airlines in this matter. Your Honor, Rule 9B, Iqbal, and as interpreted and applied in the FCA context by Nathan v. Takeda, prevent fishing expeditions in search of a false claim. Okay. Well, this isn't that. I mean, there's more there. I mean, I think you have to look at what's been pleaded, and they have pleaded, as Mr. Norton pointed out, there's only one customer in the world and there's only one provider in the world. I mean, this isn't a $1.5 billion was paid by the customer. So there's more here than just a random fishing expedition. So it seems to me your launch into hyperbole doesn't really help a lot. Well, Your Honor, with regard to there being, Your Honor. I mean, the question is, does this unique situation of only one customer and one provider create a plausible inference that necessarily a false claim was presented to the government and paid by the government to United? Isn't that what we have here? Your Honor, those are the factual circumstances here. But as the district court ruled, it is not a plausible inference. It is not a plausible inference. And it is not a plausible inference that just because there's only one payer, it's a one-on-one circumstance, that there, as a result, must have been a false claim necessarily submitted. There could have been a false claim submitted, but that's based on speculation. If you look at the allegations in the Second Amendment complaint, there are no allegations that provide the level of specificity that this court has required in Nathan. You used the word necessarily. Yes, Your Honor, necessarily, which means that there are facts. Let me step back. 9B is still the standard for making allegations with regard to presentment. What this court did with the Nathan rule is provide an alternative test to determine whether the 9B level of specificity, the plausible inferences required by Iqbal, have been met with regard to the presentment element of the false claims case. And here, as the district court ruled, that test has not been met because — Okay, but what — I'm sorry. Go ahead, please. But what about the fact, when you have specific allegations in the complaint, that for a long period of time these tools were noncompliant, they performed the work with tools that hadn't been certified, and that even for a period of a few months these tools didn't even exist on the premises? Why isn't that enough? Well, Your Honor, it's not enough because if you look at the actual allegations, the specific allegations in the Second Amendment complaint, there's not one of them that necessarily led to submission of a false claim. So let's talk about specifics. On uncalibrated tools, there are allegations that there was a set of torque wrenches that was uncalibrated, but the complaint also — For years, right? I don't think that one is for years, Your Honor, but there — More than a year, I think, uncalibrated. It may have been. It may have been, Your Honor. It might be absolutely correct. But the allegations also indicate that there was another set of torque wrenches that were calibrated. And there's no allegation that only the uncalibrated tools were used. There's no allegation that an uncalibrated tool was used on any specific engine, on any specific date, that led to the submission of any specific false claim. What about the radiometer? There were no radiometers, according to the allegations, on the premises for three to four months. Your Honor, there is no allegation in this case that a radiometer is even required for either every repair or to be used on every engine. There could have been, for example, the second amendment complaint does allege that there were, on any given day, 40 engines undergoing repair. That's one of the allegations in the complaint. There's no allegation that a radiometer was required to be used on any engine at any specific time. There's no specific allegation that on any specific date there was a requirement for a radiometer, and that requirement was not met. So if you look at the specifics of what's being alleged, even with regard to some of the most egregious claims, which might be viewed as the pencil-whipping claims. What was interesting to me, I looked at some of the comparison between this case and between the Lusby case and the Grubbs case. And the level of specificity is so much greater in that First Circuit case or the Seventh Circuit case and wherever Grubbs was. But this is general, and it just doesn't get into... Those other cases started talking about specific engines, specific tools, specific employees that were involved in preparing the false claims and that eventuated in a false claim. And this doesn't get halfway there when you look at what those other circuits are requiring. And I'm not claiming for a minute that this subcontractor is doing excellent work. I don't know. I have no idea. But what really troubles me is that there are examples of regulatory noncompliance all over the country, and this may or may not be one of those. But that's not... The False Claims Act serves a very focused purpose. And it just isn't... You just can't say, well, these tools fail to comply with this federal regulation. Or these inspectors weren't trained in the way that federal regulation demands. That sets in motion a whole different train of enforcement actions and remedies and everything. But whatever it is, it isn't a False Claims Act claim. That's the problem. Okay. Mr. Harrison, I guess what's troubling me here is the plaintiff is saying during... Let's just take the radiometer. The plaintiff is saying that during this three- to four-month period, United signed off and made certifications that the required inspections were made, those that required a radiometer. And there wasn't even one on the premises. Why isn't that sufficient to allege, aside from the presentment of the claim, but I'm saying in terms of identifying the false claim that was being made. In other words, no radiometer on the premises. They were required to have one. And it was required to be done in the work that was being certified for the FBI inspection. Why isn't that enough? Your Honor, it is not enough because it does not meet the level of specificity. Why not? It's a broad allegation. No, it's a... Sorry. No. Your Honor, I would contrast the allegation with regard to the radiometers with the allegations in Grubbs, which is a Fifth Circuit decision, or Luxby. In Luxby, there was a chart that was actually incorporated into the complaint that had specific part numbers, specific dates. Well, it may be better pleaded in those cases, but what I'm saying is why haven't they plausibly alleged that there were false claims submitted, at least as far as this radiometer? To me, that's just like a glaring, glaring problem. Why aren't they at the pleading stage? They're not required to prove everything. They're just saying you're required to have a radiometer, you certified the inspections that the required inspections using the radiometer were done, and they weren't. And the equipment was not even on the premises. Why isn't that enough to just say, see if they can prove their case? Maybe they can't. Maybe this is a weak case, ultimately. And just because other cases were pleaded more specifically, to me, doesn't seem like a defense that this one's inadequate. You have to say why this case is inadequate. Yes, Your Honor. With regard to the radiometer, there is no allegation that there was any specific instance in which there was a test that was required by the contract that was not performed. That allegation is not in the complaint. Well, I thought it wasn't. I thought they said, didn't they, that during this period of time, the required inspections were conducted, and the instrument required to conduct the inspections was not even on the premises. Your Honor, I don't believe there's Paragraph 129, maybe? Yes, Your Honor. I don't have it. I'm recalling the allegation that there was a four-month period of time, I believe, where it's alleged that the radiometer was not on the premises. Well, Paragraph 129 says, Despite not possessing an FPI radiometer between December 2013 and March 2014, United continued to sign off on JICS and CMTSs, That's pretty specific. What's deficient about that? Your Honor, what is deficient about that allegation is that there is no allegation, there is no specificity with regard to the presentment of a false claim. So let me posit, how would United identify what the false statement is in that particular, with regard to that particular allegation? That's the false statement. The work required the use of the radiometer, and the work was done. That's the false statement. But, Your Honor, there is no allegation in this complaint that such a false statement? No, Your Honor. There's no allegation that they either made it or submitted it to not only the Federal Government, but not even Pratt & Whitney. Well, they said in Paragraph 129 that United signed off on these. But what does sign off mean, Your Honor? Well, isn't that proof rather than allegation? In other words, they certified this is true, I think is a plausible reading of that paragraph. Well, Your Honor, I would suggest that based on the allegations of the complaint, what they're saying is that a United inspector signed off and approved that engine as serviceable. And what we have here is a dispute between the relator who makes allegations with regard to when certain repairs should be done or shouldn't be done, and United, whose inspectors are signing off saying that that engine is sufficient. What concerns me here is that, you know, you have all of these. These companies are regulated to a fair degree. You have OSHA regulations. You have this kind of regulation. And maybe they don't comply with those. But I don't understand the last step of how it eventuates in a false claim other than through inference and speculation. And actually, we are entitled to draw an inference if there is a process, a necessary process of which presentment is a part. Yes, Your Honor. And there's no ‑‑ I'm sorry, Your Honor. I was going to say there is no description of any presentment process here. There's no description of how United or who, what, when, where, or how United would have submitted claims even to Pratt & Whitney, much less how it would have gone up the chain to the government. I have a different question. So walk with me, please. The retaliation claim is not subject to my review. Correct. Correct. So United was aware that Grant had complained about its practice of pencil whipping repairs. Correct? Correct. The second amended complaint alleges that Grant informed United's director of maintenance that he and his colleagues were forced to sign off on repairs that had not been completed. Correct? I'm not sure if that last ‑‑ That were not complete. I'm taking this from the second amendment. I can pull out the second amendment complaint and walk it through. Fair enough, Your Honor. The complaint also alleges that Grant attended an investigatory meeting where he discussed the problem of pencil whipping with several managers. Correct? In the second amendment complaint. Correct. The second amended complaint also alleges that management was upset when he raised the pencil whipping issue and that his concerns were frequently met with irritation and in one specific incident, profanity. I think that's it. JA 134, 135. Subject to check. Subject to check, Your Honor. And finally, the second amended complaint alleged that United informed Grant of its intention to terminate him one day after his last complaint to the director of maintenance and a short time after he was observed taking photographs of a tool that he alleged had not been calibrated in a number of years. Correct? Correct. The photograph was of a calibrated piece of equipment. Why is it that enough to support a reasonable inference of termination in retaliation for protective activity for purposes not constrained by Rule 90? Your Honor, it's not enough because in this circuit and every circuit, concerns that are expressed by employees are not the same as protected activity under the Federal Claims Act. Because this is more than, I mean, they apparently thought there were enough concerns that they fired him the next day. I don't understand why this doesn't rise to the level of at least implicitly suggesting for purposes of reading the second, for purposes of reading the allegation, that a lawsuit might be contemplated. I don't understand, I mean, it seems like an awful lot to be told, to be asked, don't you have anything better to do than to mess things up after complaining that the engineering department was performing tests without proper equipment. What more could he have done to articulate his concerns about allegedly shoddy maintenance practices? After which, within a very, very short period of time, he was, as I recall, escorted off the floor. Your Honor, with regard to what more he could have done, none of the allegations that he of the concerns he expressed. At JA 143, paragraph 175, under the heading United's Retaliation Against Related Grant, he said that he repeatedly expressed concerns to his supervisors. Now, Mr. Grant was a lead maintenance tech. He was also the union shop steward. His job was to raise these types of regulatory concerns, and he did so repeatedly. His expressions of concern were met with irritation, if not rejection. It would seem to me that in the ordinary EEOC context, this would not, this would be, in the ordinary Title VII context, this would be a slam dunk for supporting the reasonable influence of retaliation. Your Honor, we're subject to the Rule 9. That's correct. This is? So this is just whether the, whether United was on notice that this was one unhappy camper. He was raising constant complaints, and apparently, at least inferably, as a result of those complaints, he was walked off the shop floor. Actually, Your Honor, there's a distinction between the FCA and a Title VII case, because in the FCA, it has to be some activity that raises above what would be the normal discourse of complaints or concerns by an employee. It has to be something that raises the specter of false claims submissions. Exactly. And he says, I'm sorry, he says in paragraph 175 that he was unable to certify work appropriately that already had been done due to lack of tools and or appropriate calibration of tools, and that employees had not received proper training or certification. So he was pretty specific. I can't do the work with the tools that aren't properly calibrated. There's a problem here. That's pretty specific. Your Honor. He didn't just do it once. He did it on a number of occasions. That is true, Your Honor. Based on the allegations of a complaint, he expressed numerous concerns. Yes, Your Honor. I'm going to try to get at this. Both of these were handled on motions to dismiss. Correct, Your Honor. They were 12B-6. But isn't there at least this difference that the complaint, that the FCA complaint on the merits, is subject to not only to Iqbal Twomley, but it's subject to a very different set of standards, which is that fraud has to be pled with particularity, and it has to be pled specifically. And that was part of the problem with that. But when you go over to the retaliation claim, you don't get the benefit of that Rule 9 pleading requirement, do you? That's correct, Your Honor. It's 8A.  All right. So your position has to be that the definition of protected activity in the False Claims Act context is different from the definition of protected activity under Title VII, right?  The cases have recognized that, but tell me why the concept of protected activity in FCA actions is different from the concept of protected activity in a Title VII action. You've got to give me a rationale for why the definition of protected activity might be different. Your Honor, because there is a statutory definition with regard to protected activity that it has to be in furtherance of, or efforts to stop, a false claim violation. And that is the difference. That doesn't mean for the substantive requirements, all of the substantive requirements, that they be pled with the particularity that you needed for the substantive fraud claim. That's correct. But it does require notice of an FCA or potential FCA violation. Your Honor, what on earth is saying that the grant that United was continually being informed, its director of maintenance was continually being informed, that he and his colleagues were forced to sign off on repairs that were not complete? Your Honor, that by itself is not an allegation that would give rise to an employer to look at that and say, my goodness, he's suggesting that there are false claims. Because that's what they do. Is it false? What does it not satisfy? Your Honor, the allegations in this case are that there are repairs that the relator believes should be made, and United had inspectors that signed off saying that they were not necessary. But even in that context, Your Honor, even in that context, the question of notice, was the employer reasonably put on notice of a false claim? Not of a dispute. He was alleging that there were false records, because there were certifications that this work had been done using these particular tools that hadn't been done with the required tools. I mean, that's pretty good notice, isn't it? That you've got to check and make sure that your work is being done as you represented to the Air Force, that it had been done? Your Honor, there is not an allegation in the complaint that with regard to his position was a lead tech, maintenance tech, as well as the union shop steward. Let me just say this. Don't you want to give a little bit of latitude to somebody who recognizes deficiencies in the maintenance and inspection of very sensitive equipment that could result in, if it's defective, it could result in tragedy and the loss of a lot of life. I just see your claim on the Rule 9 and the merits a little bit differently from the retaliation claim, because of the pleading standards. I think they're different. And I also think that for the statute to work correctly, there ought to be some leeway given to people to report deficiencies in the maintenance of very sensitive equipment and have those deficiencies addressed without being thrown out of work. I mean, if you can intimidate people with a loss of employment to the point where they're not going to raise anything, and the process suffers as a result because you have to have some process of accountability for this very sensitive work that's going on here. And so you don't want people just bounced out of work every time they say, look, you've got to have some, this needs to be redressed, this needs to be redressed. I mean, it just seems to me that the two claims you're raising have very different levels of strength. I don't know. Maybe this thing is all on a motion to dismiss. After discovery and the rest, it might go out on summary judgment. I don't know. I don't know. Who knows? But don't we just draw the, don't we exercise too much of a chilling effect on the reporting of what might be very serious infractions? I don't know. You know, that's my concern, not with the merits of a complaint. I mean, I think it's as vague as, it's too vague for the rule now. But for the retaliation, that's a little bit different. And if I could add on to what Judge Wilkinson's observing, it seems to me that that was the purpose for the amendment. I mean, the amendment broadened that subcategory too, and it reflects a congressional intent for just what Judge Wilkinson's saying. We don't want to discourage these claims by making it so narrow for somebody to claim retaliation. And we don't want people to be, we want to have a deterrent effect for employers, not just firing and trotting people off the premises because they raised legitimate concerns. It seems to me that the broadening of the statute in 2009 in terms of retaliation reflects exactly the intent of Congress that we take a broader view of these types of claims. Your Honors, I certainly understand and agree with the concerns with regard to, Your Honor, Judge Wilkinson's concern about the nature of the work these people are doing. If the rule is that every expression of concern about maintenance, because this is what everything they do is maintenance on important. I want people to listen to concerns and not just to react by throwing somebody out. I mean, you want, what you want to do is encourage a dialogue. That's how people improve. And, you know, it's, you can't just leave the whole process in the dark. That's my problem. And the allegations on a complaint is that when he made complaints, there were audits, there were investigations. But that seems to me something that's probably in this case better left to summary judgment. We just, there's a lot on that aspect of it that needs a little bit further development in my judgment. I don't know. But it's a pretty quick reaction to say on a motion to dismiss that somebody who's trying to make the process work and bring up claims should be just bounced out. Your Honor, I see that my time is well past. I appreciate Your Honor's consideration. We thank you for your argument. You're very welcome, Your Honor. Thank you, Your Honor. Would you have some rebuttal time, Mr. Norton? Thank you, Your Honor. As to claim presentment, we certainly agree that it was one customer and one provider. And under Nathan, what we're talking about here is Nathan's standard of unnecessary inference of claim presentment. And in that regard, we've alleged that there were time periods that two separate types of violations were ongoing and un-remediated. The first we mentioned before, which was the FPI radiometer, for five years not being used and not being calibrated, and then for the four-month period being nonexistent on the facility at all. I'm sorry, I know you don't remember. Do we have reason, is there anything in the record or in the complaint which gives us assurance that every bill that was submitted to the government was paid in total? Is there a clear line between a bill from United to the Air Force and without review or question? Do you see what I'm getting to? What I'm trying to find out is, was there any intermediary that looked at, reviewed, questioned? Because that's part of my problem with the presentment claim. I'm completely clear on everything you're saying and inclined to agree about the specificity with respect to the saying that the claims were false. It's with respect to what actually gets submitted and paid is the end piece of that process that I don't grasp. United paid for a complete sustainment system for the C-17, and including within that $1.5 billion for the engines to be maintained. You're saying the Air Force paid. Oh, sorry, the Air Force. Sorry, Your Honor. And part of that was that a certain number of these engines be available at any given time in a serviceable pool for installation on a wing as needed of a C-17. And so on this point, I think one of my responses would be that Mr. Grant worked in the jet shop as a lead aviation maintenance technician but not in the accounting office. And so while he was able to observe these pervasive and continuous violations due to the lack of equipment and false certifications of repairs, he doesn't have a view. It seems to me, again, that the observations related in large part to regulatory noncompliance. There's a way to preserve the values of this statute without turning it into a regulatory noncompliance statute. One of the things is to require false claims and a strong necessary inference that something led to false claims. The other way to preserve the value of the statute is with people who are raising regulatory concerns and noncompliance concerns aren't just thrown out. That way you don't distort the statute and you preserve some room for regulatory noncompliance. But going all your way, going all the other way, just seems to me very risky. You know, Mr. Norton, I'm sorry, Judge Wilkinson. No, you go ahead. No, no. You know what I'm worried about? And I don't know that you can help me here. I mean, I think that Judge Wilkinson raises a really good point. But what I'm worried about is that the False Claims Act is for white-collar claimants only and that blue-collar claimants have no place in it. You see what I'm saying? If you have to have proof of accounting and going through the business office in order to maintain a False Claims Act case, that nobody who does blue-collar work will ever have a False Claims Act case. And I know you're going to be agreeing with me on that, so I don't. But then how do we balance it against Judge Wilkinson's concern that it's a very strict pleading standard? How do you balance those two things?  I think that if I could direct the Court to paragraphs 174 and 175, here we have a very specific couple of examples of false records that United submitted. They're stamped for Air Force only. They have United's insignia, and they check the boxes where it says overhauled. There's an inspector with a stamp on it. This was glued directly to an engine, and it went right back to the Air Force in the climate-controlled engine pool barn. And so this is what we do have. It's very specific. And, Mr. Grant, report. Do you have an appendix page cite for that? Yes, Your Honor. That's 112 and 113. And this is, you know, we included a photograph of this because this shows exactly how United submitted and caused to be submitted this false work. We're simply saying in conclusion here that this is not an impossible pleading standard to make. There are lots of False Claims Act claims that the courts let through the motion to dismiss and that satisfy the Twombly-Iqbal standard. The law books are full of False Claims Act actions that get past the motion to dismiss stage. But when you compare this with those, this would almost be unprecedented to allow something like this to get past the Rule 9 standard. As I say, I think the way to try to preserve these, well, we've chewed the bone, but I think the way to try to resolve this is give people, my friend Judge Keenan raises the question about blue-collar reporting, and that's a good point. And I guess I would say that in protecting people against retaliatory discharges for raising concerns, we go a long way to protecting people at all levels of the company and in all different kinds of jobs and from all different walks of life. So there's a way to, I think, be sensitive to a good point that was made. But do you have some final comment? I want to give you the last word. Thank you, Your Honor. And I certainly agree with your observations about the importance of the retaliation part of the statute. I would just leave the Court, if I may, with Mr. Grant's words, where he described not merely concerns, but that the Air Force, and this was to Mark Eldred, the managing supervisor of maintenance, the Air Force pay us to repair these engines to certain standards. That's Paragraph 180, 144 of the Joint Appendix. There are rules and contracts we are obligated to follow. That's the same paragraph. And then he goes on to tell them that United wanted to pass the buck to our customer, the U.S. Air Force, who is paying good money to have us fix these discrepancies. And that's 119 and 20 at Paragraph 92. Thank you. Thank you. We appreciate your argument very much. We will adjourn Court and come down and recounsel. This Honorable Court stands adjourned until tomorrow morning. God save the United States and this Honorable Court.
judges: J. Harvie Wilkinson III, Allyson K. Duncan, Barbara Milano Keenan